231 F.3d 1156 (9th Cir. 2000)
 FLORIAN SEVER; DAVID HIEBERT; MARK W. SIMMONS; ROBERT HENRY KINVILLE; EDWARD REINER; UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
ALASKA PULP CORPORATION, Respondent-Intervenor.
ALASKA PULP CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
FLORIAN SEVER; DAVID HIEBERT; MARK W. SIMMONS; ROBERT HENRY KINVILLE; EDWARD REINER; UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, Respondents-Intervenors.
 Nos. 98-71123, 98-71446
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 13, 2000
Filed November 6, 2000
 
 [Copyrighted Material Omitted]
 Terrance G. Reed, Alexandria, Virginia, for petitioners Florian Sever, et al.
 Ethan P. Schulman, of Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, California, for petitioner Alaska Pulp Corporation.
 Fred B. Jacob, National Labor Relations Board, Washington, DC, for the respondent.
 Petitions for Review of an Order of the National Labor Relations Board. Agency Nos. 19-CA-1924 219-CA-19377 19-CA-19582 19-CA-19322 19-CA-19342 19-CA-19564 19-CA-19610 19-CA-20039 19-CA-19242
 Before: Joseph T. Sneed, Andrew J. Kleinfeld, and A. Wallace Tashima, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 Florian Sever, et al. (the "Employees") and the Alaska Pulp Corporation ("Alaska Pulp") have separately petitioned this court to review an order that the National Labor Relations Board (the "NLRB" or the "Board") issued against Alaska Pulp on August 27, 1998. See Alaska Pulp Corp ., 326 NLRB No. 59, 1998 WL 600786, at *1 ("Alaska Pulp III"). The order describes how Alaska Pulp is to compensate those employees against whom it committed various unfair labor practices following a strike at one of its facilities in 1986-1987.
 
 
 2
 The Board has filed a cross-application for enforcement of the order. The Employees have intervened to support the Board's cross-application to the extent it relates to Alaska Pulp's petition, and Alaska Pulp has intervened on behalf of the Board against the Employees. Our jurisdiction over these matters is described in Section 10(e) and (f) of the National Labor Relations Act, as amended (the "Act"). See 29 U.S.C. S 160(e), (f).
 
 
 3
 For the reasons stated herein, we reverse and remand in part, enforce and remand in part, and enforce in part.
 
 I.
 STATEMENT OF FACTS
 
 4
 This is a complex case, which makes understanding the procedural and factual history imperative.
 
 
 5
 A. THE STRIKE AND SUBSEQUENT RECALL OF WORKERS
 
 
 6
 Alaska Pulp owned a pulp processing mill in Sitka, Alaska. For approximately 27 years, the United Paper workers International Union, Local 962 represented production and maintenance employees at the Sitka plant. The employees participated in an economic strike from July 1986 to March 1987, when they voted in an NLRB-conducted election to decertify the union.
 
 
 7
 By the time the employees made an unconditional offer to return to work, Alaska Pulp had filled all of its nearly 300 strike-empty positions with permanent replacements and crossovers. See NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 346-47 (1938) (an employer may hire permanent replacements during an economic strike). Consequently, the company placed many of those remaining strikers who had requested reinstatement, nearly 150 individuals, on a preferential recall list. This type of list is commonly known as a "Laidlaw list" after Laidlaw Corp. v. NLRB, 414 F.2d 99 (7th Cir. 1969) (holding that while an employer is not obligated to discharge permanent replacements to make room for returning economic strikers, the employer must place the former strikers on a preferential recall list).
 
 
 8
 Under non-strike circumstances, Alaska Pulp filled job openings within its production departments by promoting the next qualified employee up a departmental job ladder. This is how the Board explained the procedure:
 
 
 9
 [W]hen a vacancy occurs, the position is filled by the individual immediately below in the line of progression who, during the course of his work, will have previously received training in the next higher job. All the other individuals move up in automatic succession, thereby opening an entry level job for any one at any progression level in one of the other departments who may want to bid into the available entry level job.
 
 
 10
 Alaska Pulp Corp., 296 NLRB 1260, 1264 (1989) (footnote omitted). Even during the strike, Alaska Pulp filled vacancies by plugging permanent replacements and crossovers into the line-of-progression system.
 
 
 11
 However, there was no established procedure for bringing those who participated in the 1986-87 strike back to work. Alaska Pulp chose not to reinstate them as soon as their former or substantially equivalent positions became available. Supervisors instead evaluated each unreinstated employee and assigned him or her a numerical ranking within the employee's old department.[1] The company then placed each unreinstated employee on the Laidlaw list in ranked order.
 
 
 12
 As soon as a non-entry-level position opened after the strike, Alaska Pulp filled it by promoting the nonstriking, replacement, or crossover worker who was next in line pursuant to its automatic progression system. Each such promotion, of course, created a vacancy in the promoted worker's old job. If that vacancy was also a non-entry-level position, Alaska Pulp filled it by promoting the next junior nonstriking, replacement, or crossover worker. This successive-promotion procedure continued until it yielded an entry level opening. At that point, Alaska Pulp selected the returning striker from the Laidlaw list who had the highest ranking for the appropriate department and assigned him or her to the empty slot.[2] Numerous strikers were recalled to these entry level positions.
 
 
 13
 B. THE UNIQUE CIRCUMSTANCES OF THE MAINTENANCE DEPARTMENT
 
 
 14
 Unlike the production departments, the maintenance department did not operate under a seniority-based progression system before the strike. Alaska Pulp instead organized maintenance employees by craft, e.g., electricians, millwrights, pipe fitters, and welders. Certain employees within each craft were appointed "leadmen." During the strike, the company eliminated the separate craft departments and assigned all maintenance workers to two broad categories: general mechanics and lead positions.
 
 
 15
 C. WORKER RESIGNATIONS IN EXCHANGE FOR PENSION BENEFITS
 
 
 16
 During two window periods after the strike in 1987 and 1988, Alaska Pulp offered all vested participants in its pension plan a lump-sum payment of their benefits in exchange for their voluntary resignations. The class of offerees included the former strikers who, as of the two window periods, had not been reinstated. Approximately 91 employees, including members of the maintenance department, chose to receive these lump-sum payments and, ostensibly, to resign. Those employees who resigned were removed from the preferential recall list. See Alaska Pulp III, 1998 WL 600786, at *32. Those who did not resign remained eligible for reinstatement to entry level positions.
 
 
 17
 D. THE UNFAIR LABOR PRACTICES OF THE ALASKA PULP CORPORATION
 
 
 18
 Alaska Pulp's response to the 1986-1987 strike generated two entirely separate unfair labor practice proceedings. See Alaska Pulp Corp., 296 NLRB 1260 (1989) (" Alaska Pulp I"); Alaska Pulp Corp., 300 NLRB 232 (1990) ("Alaska Pulp II").
 
 1. Alaska Pulp I
 
 19
 Following the strike, a number of individual employees filed unfair labor practice charges against Alaska Pulp that challenged, inter alia, the company's practice of returning strikers only to entry level positions. The Regional Director for Region 19 of the Board, which is based in Seattle, Washington, then issued a complaint alleging that Alaska Pulp had violated Section 8(a)(1) and (3) of the Act.[3] See 29 U.S.C. S 158(a)(1), (3). The Director argued that the entry level approach served no business purpose and ensured that returned strikers would always hold positions inferior to permanent replacements and crossovers.
 
 
 20
 Alaska Pulp responded that an order forcing it to place strikers in their old positions would undermine its right to reinstate workers based on merit. Put more precisely, Alaska Pulp claimed that, if not all given entry level positions, the strikers would "leapfrog" each other up and down the merit rankings as their former jobs randomly became available. A prohibition against starting returnees in the lowest positions would thereby defeat its ability to reinstate workers solely in order of their relative worth. See Alaska Pulp I , 296 NLRB at 1266.
 
 
 21
 After a hearing in 1988, an ALJ found that offering only entry level positions to former strikers was an unfair labor practice. This finding was subsequently affirmed by the NLRB, which noted that Alaska Pulp's reinstatement plan improperly denied former strikers access to higher paying jobs, subjected them to potential layoffs, and eliminated their seniority. See Alaska Pulp I, 296 NLRB at 1266. The Board also determined that Alaska Pulp had unlawfully eliminated several strikers from the preferential recall list and had terminated an employee because of his union activity. See id. at 1269-77. However, the Board found the evidence "insufficient" to support a separate charge that Alaska Pulp, for discriminatory reasons, placed five former union officials lower than they should have legitimately appeared on the Laidlaw list. See id. at 1269. It is worth appreciating that after this unsuccessful charge no party has come any closer to proving that Alaska Pulp ordered the recall list in such a way as to punish union leaders.
 
 
 22
 As a remedy for the unfair labor practices it found, the Board ordered Alaska Pulp to "offer reinstatement to qualified employees on the preferential recall list to any and all positions in each department and each progression level thereof which have been available since the termination of the strike, in a manner consistent with this decision." Id. at 1277. It further required Alaska Pulp to "make whole" for any loss of pay and benefits those strikers who already had suffered by the entry level reinstatement plan. See id. The determination of which workers were harmed was saved for future compliance proceedings. See id. Finally, the Board ordered Alaska Pulp to include on the preferential recall list five employees it had unlawfully excluded for alleged strike misconduct. See id. at 1277-78.
 
 
 23
 In their original charge to the Region, the employees also alleged that ranking and reinstating employees by merit was discriminatory in light of Alaska Pulp's historical reliance on a seniority based progression approach. The Regional Director dismissed this allegation by letter dated August 31, 1987. He concluded that "it was not illegal for [Alaska Pulp] to devise such a [merit] recall system or to recall employees by department." The Office of Appeals sustained the Region, noting that the evidence failed to indicate that the new merit recall system was unlawfully motivated or instituted.
 
 
 24
 When the employees and the General Counsel tried to raise the same issue before the ALJ, the judge specifically held that the Regional Director's partial dismissal foreclosed any determination of whether Alaska Pulp was precluded from applying its merit system. After quoting language from the Regional Director's dismissal letter, the ALJ concluded that "[Alaska Pulp] may use its merit recall system in a manner which is not inconsistent with this decision." Id. at 1266. The dismissal was never appealed. See id.
 
 
 25
 When the Board affirmed the ALJ, it also noted how the Region's dismissal had a preclusive effect: "[T]he question whether [Alaska Pulp] could lawfully use a merit recall system . . . was previously resolved in Case 19-CA-19242 and is therefore not before us." Id. n.3. Thus, the issue at bar was simply "whether [Alaska Pulp] could lawfully relegate unreinstated strikers who are offered reinstatement to entry level jobs only." Id. This crucial point merits repeating: Alaska Pulp I determined that Alaska Pulp had to reinstate strikers to their pre-strike or substantially equivalent positions; it did not determine the order in which that reinstatement was to take place. Indeed, the Board clearly affirmed the ALJ's "rulings, findings, and conclusions," which explicitly contemplated that Alaska Pulp's merit rankings could be used to determine the order in which would-be reinstatees would be compensated. Id. at 1260 (footnote omitted).
 
 
 26
 This court enforced Alaska Pulp I on September 18, 1991. See NRLB v. Alaska Pulp Corp., 944 F.2d 909, 1991 WL 181760 (9th Cir. 1991) (unpublished disposition).
 
 2. Alaska Pulp II
 
 27
 In Alaska Pulp II, a completely separate case, four former strikers from the maintenance department charged, inter alia, that Alaska Pulp violated the Act by improperly denying them reinstatement under its entry level plan. See Alaska Pulp II, 300 NLRB 232. As the entry level plan was not at issue in Alaska Pulp II as it was in Alaska Pulp I , the Board assumed its legality. It then upheld three of the four charges on the merits, determining that Alaska Pulp's failure to give valid reinstatement offers to three maintenance employees was unlawful. The fourth charge, involving Babette Sisson, who is a key party in this appeal, was dismissed on statute of limitations grounds. See id at 239.
 
 
 28
 This court enforced Alaska Pulp II on August 20, 1992. See NLRB v. Alaska Pulp Corp., 972 F.2d 1341, 1992 WL 203916 (9th Cir. 1992) (unpublished disposition).
 
 E. THE COMPLIANCE PROCEEDINGS
 
 29
 Alaska Pulp I and Alaska Pulp II were consolidated for the purpose of compliance proceedings. See C.F.R. S 102.52 et seq. In its initial attempt to implement the Board's will, the Region interpreted the decisions as implying that the merit ranking system was itself inherently discriminatory. Consequently, the Region issued a compliance determination that utilized the seniority-based progression system to determine reinstatement order. When Alaska Pulp objected, the NLRB's General Counsel reversed the Regional Director and ordered recalculation based on Alaska Pulp's merit rankings.
 
 
 30
 The Regional Director published its corrected calculations in an amended compliance determination, which the Employees subsequently appealed to this court. We remanded so that the Board could, as it requested, "clarify its prior order and address various issues raised by [the Employees]." April 3, 1992, Motion for Remand at 3.
 
 
 31
 The Board then ordered the Regional Director to present calculations using both departmental seniority and merit ranking as alternatives for the administrative law judge to consider at a compliance hearing. See December 15, 1992, NLRB Order. A third compliance specification consistent with the order was generated. In its answer to this specification, Alaska Pulp reiterated its position that merit rankings should determine recall order. It also challenged the Board's decision to give back-pay to those former strikers who terminated their employment with Alaska Pulp in order to receive the lump sum payment of pension benefits. Finally, it argued that the majority of the 107 discriminatees unequivocally abandoned their jobs, somehow forfeited their right to back-pay, or failed to mitigate their losses.
 
 
 32
 The compliance hearing was held in May 1993. It lasted 18 days, during which Alaska Pulp told the judge that it would close the Sitka pulp mill by September 30, 1993. A fourth compliance specification was propounded to account for the closure. On September 27, 1993, the administrative law judge issued a full supplemental decision. The judge concluded that seniority was the proper method for recall, rejected Alaska Pulp's major objections to the compliance specification, and resolved Alaska Pulp's specific challenges to the back-pay calculations for the 107 strikers.
 
 
 33
 The Board's General Counsel, the Employees, and Alaska Pulp filed exceptions.
 
 
 34
 F. THE SUPPLEMENTAL DECISION AND ORDER OF THE NLRB
 
 
 35
 Thereafter, a three-member panel of the Board issued the August 1998 supplemental decision and order that underlies this appeal. See Alaska Pulp III, 1998 WL 600786, at *1 (1998). Over a strong partial dissent by Member Hurtgen, Chairman Gould and Member Liebman affirmed the ALJ's use of seniority for calculating Alaska Pulp's back-pay obligations. See id. at *3. The majority also agreed that AlaskaPulp's unlawful failure to offer former strikers their pre-strike jobs made it impossible to tell whether those who resigned to obtain their pension benefits in lump sum expressed a clear choice not to return to the company. See id. Consequently, the majority determined that Alaska Pulp's back-pay obligations to these particular strikers should be calculated without regard to the date of their resignations. See id.; but see id. at *23-24 (Hurtgen, M., dissenting from the majority's reasoning but partially concurring in the result). Finally, the Board reversed the judge's determination in 17 cases where strikers were said to have tolled their back-pay or abandoned their jobs. See id. at *7; but see id. at *24-27 (Hurtgen, M., dissenting in part).
 
 
 36
 As a remedy, the NLRB ordered that for each discriminatee Alaska Pulp: (1) pay a certain amount of back-pay, plus interest; (2) establish and contribute to a 401(k) plan; and (3) grant a specified amount of credit in its defined benefit retirement program. See id. at *21. According to Alaska Pulp, the Board's August 1998 ruling increased the company's total liability for back-pay, exclusive of interest and other relief, by approximately $1.6 million, from $5,996,625 to $7,580,386. See Petitioner's Opening Br. at 24. When interest, pension credits, 401(k) contributions, and severance pay are included, this amount may well exceed $11 million. See id. at 24 n. 12.
 
 II.
 STANDARD OF REVIEW
 
 37
 We uphold an NLRB decision when substantial evidence supports its findings of fact and when the agency applies the law correctly. See Northern Mont. Health Care Ctr. v. NLRB, 178 F.3d 1089, 1093 (9th Cir. 1999). The substantial evidence test compels us to evaluate the entire record, although we may not "displace the NLRB's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us ] de novo." Walnut Creek Honda Assocs. 2, Inc., v. NLRB, 89 F.3d 645, 648 (9th Cir. 1996). Indeed, we must enforce the Board's judgment if, given the record, a reasonable jury could reach the same conclusions. See Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 366-67 (1998). The test is decidedly objective. See id. Furthermore, we give special deference to the Board's credibility findings. See Nabors Alaska Drilling, Inc. v. NLRB, 190 F.3d 1008 (9th Cir. 1999).
 
 
 38
 We also defer to the rules imposed by the NLRB if: (1) they are " `rational and consistent with the [National Labor Relations Act],' " see Allentown Mack , 522 U.S. at 364 (quoting Fall River Dyeing & Finishing Corp. v. NLRB , 482 U.S. 27, 42 (1987)); and (2) the Board's " `explication is not inadequate, irrational or arbitrary,' " see id. (quoting NLRB v. ErieResistor Corp., 373 U.S. 221, 236 (1963)).
 
 
 39
 Unlike all other major federal administrative agencies, the NRLB uses adjudication instead of formal rule making to promulgate most of its legal rules. See id. at 374. Even so, the NLRB remains subject to the Administrative Procedure Act requirement of reasoned decision making. See id. The Supreme Court has therefore warned: "Because reasoned decision making demands it, and because the systemic consequences of any other approach are unacceptable, the Board must be required to apply in fact the clearly understood legal standards that it enunciates in principle . . . . " Id. at 376. When and to the extent that the NLRB does not apply its enunciated rules in this manner, it is not entitled to the "substantial deference" it can ordinarily expect as it interprets its regulations. See id. at 377, 118 S.Ct. 818.[4]
 
 
 40
 Finally, we overturn the Board's chosen means of remedying an unfair labor practice only for an abuse of discretion. See New Breed Leasing Corp. v. NLRB, 111 F.3d 1460, 1464 (9th Cir. 1997). We are not authorized to substitute our judgment for the Board's if it is simply a question of how best to correct the effects of unfair labor practices. See id. Thus, our power under the Act "to make and enter a decree .. . modifying, and enforcing as so modified" orders of the NLRB is limited to "the confines of law" and does not infiltrate the "more spacious domain of policy." Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 899 (1984). Moreover, we must resolve any doubts about the remedy against the perpetrator of the unfair labor practice, in this case Alaska Pulp. NLRB v. International Bhd. of Elec. Workers, Local 112, 992 F.2d 990, 993 (9th Cir. 1992).
 
 III.
 DISCUSSION
 
 41
 For the purposes of this appeal, the parties raise a number of issues with regard to the compliance order. First, Alaska Pulp argues that: (1) the Board should have used its merit rankings to calculate the amount of back-pay that it owes former strikers; (2) Alaska Pulp's failure to offer workers reinstatement to their pre-strike or equivalent positions did not foreclose a determination of whether the workers intended to leave the company when they resigned to receive their pension benefits; (3) the Board improperly calculated the amount of back-pay owed to members of the maintenance department and former employee Babette Sisson; and (4) the Board's award of back-pay to 11 other workers was not supported by substantial evidence. Second, the Employees claim that the Board erred by not awarding back-pay to employees Joelle Eimers and Ron Proctor. Finally, the Board contends that it is entitled to enforcement of its back-pay calculations and of those portions of its order which have gone unchallenged. We shall consider these issues seriatim.
 
 
 42
 A. ISSUE ONE: PRE-STRIKE SENIORITY VERSUS MERIT
 
 
 43
 Alaska Pulp claims that by using pre-strike seniority for its calculations the Board violated both binding precedent and the law of the case, compromised Alaska Pulp's due process rights, and punished Alaska Pulp impermissibly. The Board argues in response that the supplemental decision and order was not inconsistent with precedent and the law of the case. It also urges us to dismiss Alaska Pulp's due process and punishment arguments for lack of jurisdiction. Finally, in the event that we do not dismiss those arguments, the Board challenges their merits. For the following reasons, we REVERSE the Board's use of seniority in calculating back-pay and REMAND for recalculation on the basis of Alaska Pulp's merit rankings. Insofar as we find that the NLRB failed to follow existing precedent in its supplemental decision and order, we need not address Alaska Pulp's due process and punishment arguments or the Board's contentions of waiver.
 
 
 44
 As Member Hurtgen noted in his dissent, "there is no requirement in the Act or in the Board's articulation of Laidlaw rights that an employer recall returning strikers on the basis of seniority." 1998 WL 600786, at *23. Indeed, an employer is entitled to reinstate workers in any nondiscriminatory manner. See Lone Star Indus., Inc., 279 NLRB 550, 551 (1986), enforced in part 813 F.2d 472 (D.C. Cir. 1987), on remand 298 NLRB 1075 (1990), vacated on other grounds 956 F.2d 317 (D.C. Cir. 1992); accord Oregon Steel Mills, Inc., 291 NLRB 185, 189-190 (1988), enforced . 134 LRRM 2432 (9th Cir. 1988). The Board's determination in Lone Star is instructive:
 
 
 45
 Barring a simultaneous recall of all former strikers, there will necessarily be discrimination within the strikers' class as to the order of individual returns to the workplace, whether the recall is by seniority, merit, age, or alphabetical order. . . . Consequently, before any burden of justification for failing to recall a striker by seniority can be imposed on a respondent, the General Counsel must establish the existence of a seniority recall right by reference to a collective-bargaining agreement or a binding established past practice.
 
 
 46
 279 NLRB at 551 (emphasis added). In this case, neither past practice nor a collective-bargaining agreement establishes a right of recall by seniority. Thus, Lone Star and its progeny permit Alaska Pulp's choice to reinstate strikers by merit.
 
 
 47
 The Board would take a different approach. It argues that rather than imposing upon Alaska Pulp a right to recall by seniority, an imposition that Lone Star and its progeny would prohibit, it was merely approximating the type of lawful reinstatement plan that Alaska Pulp would have used if the company had actually returned strikers to their pre-strike or substantially equivalent positions. In support, the Board quickly points to the testimony Alaska Pulp's general manager Jesse Cline gave prior to Alaska Pulp I. Mr. Cline attempted to justify the company's entry level approach by demonstrating an unbreakable link between the merit rankings and the placement of workers in entry level positions. See 296 NLRB at 1266 (quoting Cline's testimony that, to use the merit rankings, "employees must, of necessity, be given the entry level jobs").[5] The Board argues that by rejecting the entry level approach in Alaska Pulp I, it was necessarily rejecting the merit rankings as well. We do not agree. Mr. Cline's testimony that reinstating workers to their old positions would defeat the rigid order of the merit rankings did not demonstrate that the company could not put the rankings to a valid use.[6]
 
 
 48
 The Board also contends that Alaska Pulp would not have used the merit rankings if it had actually kept the Sitka plant open and then had to reinstate the workers to viable prestrike positions. This is simply speculation. Whether or not the Board is right about what Alaska Pulp would have done if it had kept the plant open, Lone Star clearly permits Alaska Pulp to use the merit rankings. The Board has never articulated a contrary rule. Thus, without proof that Alaska Pulp used its rankings to discriminate against certain strikers, Alaska Pulp could have reinstated them using any approach it wanted. Even alphabetical order would have sufficed. See Lone Star, 27 NLRB at 551.
 
 
 49
 The Board further insists that this court must, barring exceptional circumstances, defer to its back-pay calculations because they are designed to restore, as closely as possible, the Employees to where they would have been absent Alaska Pulp's unfair labor practices. Clearly, the Board's goal in proceedings like this must be to do its best to restore the status quo ante by reconstructing the circumstances that would have existed but for the labor abuses. See Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194 (1941). However, all of the cases the Board cites in support of deference to its calculations deal with challenges to the Board's choice of mathematical formulations for calculating back-pay; they do not give the Board the right to select a recall order. See, e.g., Coronet Foods, Inc. v. NLRB, 158 F.3d 782, 800 (4th Cir. 1998) (upholding the Board's use of a "projected earnings" formula instead of a "replacement earnings" formula); Woodline Motor Freight, Inc., 305 NLRB 6 n.4 (1991), enfd. 972 F.2d 222 (8th Cir. 1992) (upholding formula chosen by the administrative law judge as "fair and reasonable"); Laborers Local 135 (Bechtel Power Corp.), 301 NLRB 1066, 1072 (1991) (rejecting the administrative law judge's formula and adopting the employer's "multiplier" as the "most accurate " means of calculating back-pay); American Mfg. Co. of Texas, 167 NLRB 520 (1967) (noting the Board's discretion in calculating back-pay).[7] Recall order is, to repeat, at the discretion of the employer's business judgment. See Lone Star, 27 NLRB at 551.
 
 
 50
 The Board majority's substitution of seniority for merit does more than merely violate this substantive principle. It also runs contrary to the Board's ruling in Alaska Pulp I, the underlying unfair labor practice proceeding, that Alaska Pulp "may use [the] merit recall system." See Alaska Pulp I, 296 NLRB at 1266. Ever since the Regional Director dismissed in August 1987 the employees' original charge that the merit rankings were themselves an unfair labor practice, instrumentalities of the Board have affirmed the use of merit rankings. It is disingenuous for the Board to claim so late in the game that the merit rankings "cannot reasonably be utilized because they were predicated on the unlawful assumption that strikers would be returning to entry level positions." 1998 WL 600786, at *3. Again, we find no evidence in the record that the merit rankings were themselves discriminatory. It makes no difference, therefore, what Alaska Pulp was originally going to do with its Laidlaw list. What matters is that the list now be used correctly, i.e., to calculate how much particular strikers would have made had they been placed in their original or substantially equivalent jobs at the appropriate times.
 
 
 51
 We believe the Board's change in position can be explained, at least in part, by Alaska Pulp's continued failure to appropriately compensate the strikers. Indeed, it is our understanding that few, if any, workers were ever reinstated to more than an entry level position. In light of this, the millions of dollars of additional liability that the seniority-based method would impose on Alaska Pulp might have appeared, in the Board's view, quite appealing. Nevertheless, the Board is bound to apply the legal principles it enunciates, see Allentown Mack, 522 U.S. at 376, and we are bound to see that it does, see Northern Mont. Health Care Ctr., 178 F.3d at 1093. Until changed, the legal principle that controls cases like this is, to repeat, that an employer can choose to recall strikers in any nondiscriminatory order, including in order of merit. See Lone Star, 27 NLRB at 551. The rule is no less applicable because Alaska Pulp closed the Sitka plant in 1993.
 
 
 52
 Ultimately, both Alaska Pulp and the Board read too much into the Alaska Pulp I decision. For example, Alaska Pulp argues that the Board "ordered" it to use the merit rankings. See, e.g., Petitioner's Opening Br. at 2, 13, 34-35. This is untrue. The Board in Alaska Pulp I simply agreed with the administrative law judge that Alaska Pulp would not be using its rankings as "originally intended" because reinstating the Employees to entry level positions was unlawful. See Alaska Pulp I, 296 NLRB at 1269.
 
 
 53
 Also flawed is the NLRB's argument that Alaska Pulp I left the order of reinstatement up to the Board when it left the "identities" of those who warranted reinstatement to be determined at the compliance proceedings. This is not a fair reading of Alaska Pulp I, which specifically noted that the order of reinstatement was not at issue. See 296 NLRB at 1260 n.3. It is one thing to figure out who were the victims of discrimination; it is quite another to choose the order of their reinstatement.
 
 B. ISSUE TWO: THE LUMP-SUM RESIGNATIONS
 
 54
 The next issue is whether the Board reasonably concluded that Alaska Pulp's failure to offer workers reinstatement to their pre-strike positions made it impossible to tell if they intended to abandon their employment when they accepted a lump-sum payment of their pension benefits. We hold that the Board did not so conclude.
 
 
 55
 We recognize that an employer may avoid reinstating an unconditionally returning striker when the employer offers unequivocal evidence that the worker intended to permanently sever the employment relationship. See Augusta Bakery, Inc., 298 NLRB 58, 59 (1990), enforced. 957 F.2d 1467 (7th Cir. 1992). Nonetheless, a striker who resigns to receive pension benefits does not by these facts alone express the intent to quit. He may still deserve reinstatement and/or back-pay. See id.; accord Medite of N. Mex., Inc., 316 NLRB 629 (1995) (holding that the employer failed to present unequivocal evidence that the striker intended to sever his employment relationship when he sought and obtained moneys to his credit in the employer's 401(k) plan); Rose Printing Co., Inc., 289 NLRB 252 (1988) (holding that strikers who executed statements of resignation to obtain retirement contributions did not abandon their employment so as to relieve their struck employer of its reinstatement obligations). Thus, when an employee resigns to receive their pension benefits, the NLRB ordinarily considers a number of factors to determine whether the employment relationship has been severed. These include whether: (1) the workers expressed an economic need for the benefits; (2) resignation was the only means of obtaining the benefits; (3) the strikers' only purpose in resigning was to receive their contributions; (4) the strikers did not obtain other employment; and (5) the strikers abandoned the strike following their resignations. See Augusta Bakery, 298 NRLB at 59. When these factors are weighed, as they were in Augusta Bakery, the employer may be unable to establish a legitimate business reason for denying reinstatement. See id.
 
 
 56
 The majority of the Board did not consider the Augusta Bakery factors in this case. It stated:
 
 
 57
 [W]e are simply unable to determine, under the subjective standards set forth in Augusta Bakery , whether the strikers unequivocally intended to abandon their prestrike or substantially equivalent positions because [Alaska Pulp's] refusal to offer full and timely reinstatement so tainted the atmosphere in which they resigned. We hold this uncertainty against [Alaska Pulp], the wrongdoer in this proceedings.
 
 
 58
 Alaska Pulp III, 1998 WL 600786, at *4 n.17. The Board majority reasoned that since the Alaska Pulp strikers resigned after learning that the best they could hope for from Alaska Pulp was reinstatement to entry level jobs, the case was factually distinct from Augusta Bakery. In that case the strikers resigned during the strike and were free from the duress of an unfair labor practice.
 
 
 59
 In spite of this distinction, the majority's decision to disregard Augusta Bakery because the resignations were, in its view, "tainted" is troublesome. Clearly, the dissent had little difficulty determining whether Alaska Pulp proved individual strikers' unequivocal intent to resign even in the shadow of the unlawful entry level scheme. See Id. at *24. Indeed, Member Hurtgen's dissent concluded:
 
 
 60
 Based on my review of the record, I find that [Alaska Pulp] has not met this burden with respect to any of the claimants who were entitled to rein statement above entry level. Many of these claimants explicitly testified that they resigned because they were not willing to start all over again at bottom level jobs with reduced wages. Others testified that they were motivated to resign by pressing economic need and had no intention of abandoning their employment. [P] With respect to strikers formerly employed in the maintenance department, however, I find that [Alaska Pulp] has shown that a number of them unequivocally intended to permanently sever their employment with [Alaska Pulp].
 
 
 61
 Id. On this record, we do not think the majority adequately justified its approach. It went out of its way to avoid articulating a new rule to fit the situation, see id., at *4 n. 17, and instead swept aside valid NLRB precedent.
 
 
 62
 The Employees argue that the Board acted consistently with precedent when it rejected Alaska Pulp's lump-sumresignation defense. They cite cases indicating that the Board refuses to toll an employer's back-pay obligations in the absence of a valid offer of reinstatement. See, e.g., Murbro Parking, 276 NLRB 52, 57 (1985) (an employee's angry statement that he "[w]ouldn't go back for twice the pay" was insufficient to toll his back-pay rights in the absence of a valid offer of reinstatement); Lyman Steel Co., 246 NLRB 712, 714 (1979) (holding that an oral agreement reached at a settlement conference did not toll the back-pay rights of workers whose employer had not yet offered them reinstatement).
 
 
 63
 However, none of the cases the Employees cite deal with resignations in exchange for pension benefits like Augusta Bakery. That case, to repeat, held that an employer has no obligation to make a valid reinstatement offer to an employee who has unequivocally severed the employment relationship by accepting pension benefits. See 298 NLRB at 59.
 
 
 64
 In Medite of N. Mex., the Board rejected an employer's claim that a striker had abandoned his employment. It did so because the striker believed his resignation was the only wayto get his pension funds; he credibly testified that he wished to return to his pre-strike job; and, though he secured alternate employment, it was not comparable to his pre-strike job. See Medite of N. Mex., 316 NLRB 629. Although the Board noted that the employer never presented the striker with a valid offer of reinstatement, the Board apparently did not consider the absence of such an offer as significant.
 
 
 65
 We therefore REMAND for a determination of whether Alaska Pulp met its burden under Augusta Bakery to prove that each employee who resigned to accept pension benefits expressed an unequivocal intent to sever his or her relationship with the company.
 
 
 66
 C. ISSUE THREE: THE AWARD OF BACK-PAY TO MAINTENANCE DEPARTMENT E MPLOYEES
 
 
 67
 The next issue is whether the Board awarded the appropriate amount of back-pay to former maintenance department workers. The Board reasoned that by improperly reinstating four lead men to entry level positions Alaska Pulp made it impossible to tell if the maintenance workers intended to sever their relationship with the company when they resigned for their lump-sum pension benefits. We disagree. Despite the improper reinstatement, the Board could have remedied this with an appropriate back-pay order. Instead, the Board chose to speculate that the company's error "may have" prompted effected workers to resign from that department in exchange for the benefits. We agree with the Board dissent that the Board should have evaluated the maintenance department employees' resignations in light of Augusta Bakery. See Alaska Pulp III, 1998 WL 600786, at *23 (Hurtgen, M., dissenting) (noting that "speculation cannot be a substitute for hard evidence"). The company may have shown that a number of the workers listed in its exceptions, see id. at *23 n. 1, unequivocally intended to permanently abandon their employment.
 
 
 68
 We REMAND so the Board may conduct the appropriate evaluation.[8]
 
 D. ISSUE FOUR: THE CASE OF BABETTE SISSON
 
 69
 The next issue is whether the Board reasonably concluded that Alaska Pulp should have awarded back-pay to Babette Sisson, who was a secondary treatment operator in the company's environmental department before the strike. To repeat, Ms. Sisson sought in Alaska Pulp II reinstatement to an entry level position in her old department. See 300 NLRB at 23439. The Board dismissed her charge because she failed to fileit within the six-month limitations period provided by Section 10(b) of the Act. See 29 U.S.C. S 160(b). However, Alaska Pulp I established that the company should have provided its employees with the opportunity to regain non-entry level positions. Since Alaska Pulp did not do this for Ms. Sisson, Alaska Pulp I gives her the right to a remedy, which in this case is the appropriate amount of back-pay.
 
 
 70
 We therefore ENFORCE the Board's determination that Alaska Pulp I entitled Ms. Sisson to back-pay if and when a reinstatement position would have been available to her. We REMAND so that the Board can calculate any amount of back-pay that she may be due in a manner that is consistent with the rest of this opinion.
 
 
 71
 E. ISSUE FIVE: THE CHALLENGE TO ELEVEN SPECIFIC DETERMINATIONS OF BACK-PAY LIABILITY
 
 
 72
 The next issue is whether substantial evidence supports the Board's conclusion that Alaska Pulp owes some amount of back-pay to 11 specific former employees.[9] Although we might have decided a few cases differently were the matters before us de novo, we believe that a reasonable jury could have concluded that each of the specified persons is eligible for back-pay. Contrary to Alaska Pulp's protestations, we find no evidence that the Board overturned any of the ALJ's credibility findings. Substantial evidence exists. See Allentown Mack, 522 U.S. at 366-67; Walnut Creek Honda Assocs., Inc. v. NLRB, 89 F.3d 645, 648 (9th Cir. 1996).
 
 
 73
 We therefore ENFORCE the Board's determination that Alaska Pulp I entitled these employees to back-pay if and when a reinstatement position would have been available to them. We REMAND so that the Board can calculate any amount of back-pay that they may be owed in a manner that is consistent with the rest of this opinion.
 
 
 74
 F. ISSUE SIX: THE CASES OF JOELLE EIMERS AND RON PROCTOR
 
 
 75
 The Employees claim that the Board erred when it determined the back-pay periods for former Alaska Pulp emloyees Joelle Eimers and Ron Proctor.
 
 1. JOELLE EIMERS
 
 76
 The Board found that Alaska Pulp's liability to Ms. Eimers extended from April 9, 1987, the day it should have recalled her to the job, until June 1988, when she left Sitka to seek medical treatment for her daughter in Seattle. We hold that the Board reasonably concluded that Ms. Eimers abandoned her position at Alaska Pulp in June 1988. Substantial evidence supports the conclusion that she would have left Sitka to seek proper medical care for her daughter whether or not the company had extended a valid reinstatement offer. We therefore ENFORCE the Board's determination that June 1988 represented the date of her abandonment.
 
 2. RON PROCTOR
 
 77
 Mr. Proctor claims that the Board incorrectly delayed thestart of his backpay period by setting it as May 13, 1987, instead of April 26, 1987. We agree with the Board that Mr. Proctor has waived his argument by not raising it in the Employees' exceptions to the administrative law judge's decision. See 29 U.S.C. S 160(e); Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 666-67 (1982); NLRB v. International Bhd. of Elec. Workers, Local 952, 758 F.2d 436, 43940 (9th Cir. 1985).
 
 
 78
 G. ISSUE SEVEN: THE UNCHALLENGED PORTIONS OF THE NLRB ORDER
 
 
 79
 The Board correctly argues that it is entitled to summary enforcement of those findings in its order that Alaska Pulp has not challenged. See Gardner Mech. Svcs., Inc. v. NLRB, 115 F.3d 636, 642 n.2 (9th Cir. 1997). Thus, we ENFORCE that portion of the order which requires the company to establish and contribute to a 401(k) plan for each discriminate. However, our conclusion that Alaska Pulp was entitled to use its merit rankings calls into question the Board's specific calculations regarding back-pay liability, mitigation, and abandonment for the strikers. We therefore leave those for redetermination on remand.
 
 IV.
 CONCLUSION
 
 80
 The Board's August 27, 1998, Supplemental Decision and Order is hereby REVERSED AND REMANDED in part, ENFORCED AND REMANDED in part, and ENFORCED in part, with each party to bear its own costs.
 
 
 
 Notes:
 
 
 [1]
 Each employee's rank was based on, inter alia, his or her medical records, the degree of "cooperation" the employee exhibited, and any relevant safety concerns. See Alaska Pulp Corp. , 296 NLRB at 1263.
 
 
 [2]
 The following is a simple illustration to demonstrate how such an entry level process could work. Assume that there were only three positions in a given department: master, journeyman, and apprentice. Assume further that the person who had occupied the "master" position before going on strike unconditionally offered to return after the strike and was the highest rated employee on the Laidlaw list for his department. Finally, assume that this person's old job had been filed by a replacement during the strike. When the replacement master leaves the company, the journeyman will be promoted and become the new master. The apprentice will then rise to assume the journeyman's job. At that point, the striking master will be eligible for reinstatement as an apprentice.
 
 
 [3]
 Section 8(a)(1) provides that"[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in section 157 of this title." Section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization." 29 U.S.C. S 158(a)(1), (3).
 
 
 [4]
 As an example, consider Allentown Mack. In that case, the NLRB determined that an employer committed an unfair labor practice by polling employees about whether they supported their union without first having a good-faith reasonable doubt that a majority of the employees supported the union. After the employer petitioned for review, the Supreme Court reversed. It found the NLRB guilty of not applying the standard it had enunciated for such cases, which required employers to demonstrate a good-faith reasonable doubt by a preponderance of the evidence. The Board's error was relying on decisions that purported to implement the preponderance standard but, in reality, required employers to submit "clear, cogent, and convincing evidence" of good-faith reasonable doubt. See id. at 376 (describing the Board's approach as "nonsense"). In so doing, the Board excluded from its fact finding probative evidence that would have proven a good-faith reasonable doubt by a preponderance of the evidence. See id. at 379-80. Put simply, the Board's error was in not doing what it said it was doing.
 
 
 [5]
 The following can be considered an appropriate paraphrase of Mr. Cline's argument:
 Ranking former strikers by merit is lawful, so Alaska Pulp is entitled to follow the order of a preferential recall list that ranks by merit. Since Alaska Pulp is entitled to follow this kind of list, the Board cannot compel it to put former strikers in other than entry level jobs. Why not? If the Board ordered Alaska Pulp to put workers into their pre-strike positions, then Alaska Pulp could not adhere strictly to list. This is because the old positions will become available on a random basis as non strikers, permanent replacements, and crossovers move on. There would be occasions when a striker would be reinstated before others who were ranked higher on the list simply because the position that the striker occupied before the strike was the first to become vacant.
 See id. (quoting Mr. Cline's testimony).
 
 
 [6]
 The following example illustrates how the merit rankings can be useful even if strikers are returned to their pre-strike or equivalent positions. Assume that Alaska Pulp had only two departments: the scalers and the graders. Further, assume that each department had six positions: two masters, two journeymen, and two apprentices (the entry level positions). Thus, in our fictitious Alaska Pulp Corporation there would be two master scalers and two master graders, two journeyman scalers and two journeyman graders, and two apprentice scalers and two apprentice graders. As in the case at bar, assume the merit rankings are by department. Thus, for the scaler department, the six scaler employees might be merit-ranked in the following order: (1) master scaler #1; (2) apprentice scaler #1; (3) master scaler #2; (4) journeyman scaler #1; (5) journeyman scaler #2; and (6) apprentice scaler #2. Now assume that a journeyman scaler position opened at the plant and that it was the first scaler position to become available after the strike. The highest rated journeyman scaler on our list is journeyman scaler #1, so he would get the job ahead of journeyman scaler #2. It is true that journeyman scaler #1 would "leapfrog" three more meritorious people in the department to get his pre-strike (or substantially equivalent) job back, but it is also true that he would be reinstated ahead of the less meritorious journeyman scaler #2.
 
 
 [7]
 The Employees cite similarly inapposite precedent in their brief. See, e.g., NLRB v. Rutter-Rex Mfg Co., 396 U.S. 258, 263 (1969) (noting that the legitimacy of the back-pay order as a remedy is "beyond dispute"); Kallmann v. NLRB, 640 F.2d 1094, 1102 (9th Cir. 1981) (holding that an employer could not be compelled to pay a greater amount of back-pay than the amount the employer would have paid its employees in the absence of the unfair labor practice). While these cases stand for the valid proposition that a Board remedy should attempt to return the parties to the status quo ante, they do not trump an employer's right to select recall order.
 
 
 [8]
 We agree with the Board's brief that Alaska Pulp II did not conflict with the Board's decision to award back-pay to the maintenance department workers. See Respondent's Br. at 34-36. As the Board notes, "Alaska Pulp I's conclusion that the system of reinstating strikers to entry level jobs was illegal does not conflict with Alaska Pulp II's more narrow conclusion that the Company applied that unlawful procedure incorrectly." Id. at 36.
 
 
 [9]
 The employees are: (1) John Petraborg, (2) Karen Ritchie, (3) Albert Bigley, (4) Roland Mears, (5) Libby Mears, (6) Kit Andreason, (7) Joseph Kilburn, (8) David Meabon, (9) Harold Frank, (10) James Lichner, and (11) Douglas Stevens.