NORTHERN MONTANA HEALTH CARE CENTER; Northern Montana Health Care, Inc.; Northern Montana Hospital, Petitioners/Cross–Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.

Nos. 97–71371, 98–70104.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1999.

Filed June 2, 1999.

As Amended June 14, 1999.

---

Donald C. Robinson, Poore, Roth & Robinson, Butte, Montana, for the petitioners-cross-respondents.

Stephen M. Rummage, Davis, Wright, Tremaine, Seattle, Washington, for the petitioners-cross-respondents.

Sharon I. Block (argued), National Labor Relations Board, Washington, D.C., for the respondent-cross-petitioner.

Aileen A. Armstrong and Charles Donnelly (on the briefs), National Labor Relations Board, Washington, D.C., for the respondent-cross-petitioner.

Before: FLETCHER, REINHARDT, and THOMAS, Circuit Judges.

REINHARDT, Circuit Judge:

At midnight between August 30 and 31, 1994, ownership of a unionized long-term nursing care facility changed over from the Lutheran Home of the Good Shepherd ("Lutheran Home") to the Northern Montana Care Center ("Care Center"), a corporate subsidiary of Northern Montana Health Care, Inc. (NMHCI).[1] This transition was accomplished without any shutdown of operations or removal of patients. However, the minimal disruption of services was accompanied by a total disruption of the collective bargaining situation.

Before the transition in ownership, the facility had employed 157 employees, 74 of whom were in job classifications that were part of the established bargaining unit. Prior to August 30, the Care Center conducted a hiring process in which employees had to reapply for their positions. By the time of the transition, 54 of the 76 positions that were part of the bargaining unit were filled by Union members.

On September 2, 1994, the United Food and Commercial Workers Union Local No. 8 ("Union") sent the Care Center a demand for recognition of the bargaining unit that had been in place at the facility. On September 12, 1994, the Care Center responded, asserting its good faith doubt

---

1. NMHCI is a nonprofit corporation which provides acute and extended health care services. It incorporated the Care Center as a corporate vehicle to own and operate the Lutheran Home facility. In addition to the Care Center, NMHCI operates another subsidiary, the Northern Montana Hospital ("Hospital"), which at the time relevant to this case was located one mile from the Care Center. The President and CEO of NMHCI serves in the same capacity for the Hospital and Care Center, and the administration, human resources, recordkeeping, and support services functions for the Care Center were performed largely by Hospital staff.

that the Union represented a majority of the employees in an appropriate bargaining unit and informing the Union that it had filed a petition with the NLRB proposing a representation election for a bargaining unit of 42 employees which excluded licensed practical nurses and individuals who were on the Hospital's payroll.

On September 16, 1994, the Union filed an unfair labor practice charge against the Care Center, stating that the Care Center was refusing to recognize and bargain with the Union in violation of section 8(a)(5) of the NLRA. The charge asserted that the Care Center was a successor to the Lutheran Home's bargaining obligation. The NLRB Regional Director investigated the charge, which served to administratively "block" the Care Center's petition, and issued a complaint against the Care Center and NMHCI as a single employer alleging that the Petitioners had violated their successorship obligation to bargain with the Union.

After a three day trial, the ALJ issued his decision on September 20, 1995, finding that the Care Center was a successor employer, rejecting its claim that it held a good faith doubt regarding the Union's majority status, and holding that it violated its duty to bargain with the Union. The ALJ also held that housekeeping, maintenance, and dietary employees who were on the Hospital payroll but worked regularly at the Care Center were properly included in the bargaining unit; however, the ALJ agreed with the Care Center's contention that the licensed practical nurses were supervisors and should be excluded from the bargaining unit. Finally, the ALJ found that the NMHCI, the Care Center, and the Hospital were a single employer and therefore imposed a bargaining obligation as well as a duty to cease and desist all unfair labor practices upon all three entities. On October 17, 1997, the NLRB affirmed the ALJ's decision in all substantial respects except that

it held that the licensed practical nurses were not supervisors and that they therefore were properly included within the bargaining unit.[2]

## STANDARD OF REVIEW

■ Decisions of the NLRB are upheld on appeal if its findings of fact are supported by substantial evidence and it correctly applied the law. *NLRB v. District Council of Iron Workers of Calif.,* 124 F.3d 1094, 1098 (9th Cir.1997). We employ the substantial evidence test even if the Board's decision differs materially from the ALJ's, although we may consider the difference as part of our review. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The significance of this difference "depends largely on the importance of credibility in the particular case." *Id.* The NLRB's reasonable interpretation and application of the NLRA are entitled to deference, and will be upheld as long as "rational and consistent with the Act." *Gardner Mechanical Services, Inc. v. NLRB,* 115 F.3d 636, 640 (9th Cir.1997).

## DISCUSSION

■ Under *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 41, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), because the Care Center was the legal successor of the Lutheran Home, the Union became entitled to a presumption of continued majority support that required petitioners to recognize and bargain with it. Petitioners do not disagree that the presumption arose in this case, but instead offer a number of defenses for their refusal to bargain with the Union: they claim that the bargaining unit was inappropriate because it included supervisors and employees of the Hospital, that they had a good faith doubt as to the Union's continued majority support, and that a duty to bargain could not be imposed upon the Hospital because it was not named as a party to the proceedings. We

---

**2.** The NLRB also found that the successor bargaining obligation ensued ten days earlier

than the date set by the ALJ. Petitioners do not contest this finding on appeal.

reject the first two arguments but agree with petitioners that the Hospital cannot be bound by the NLRB's order.

### Supervisory status of charge nurses

█ The Care Center is divided into east and west wings, and a charge nurse is always present on each wing. The primary responsibility of the charge nurse is to assess patient care needs and assure that appropriate treatment is administered. This includes directing certain aspects of patient care and assigning tasks to employees. Five licensed practical nurses work at the Care Center, and all regularly serve as charge nurses. However, if a licensed practical nurse is the charge nurse on one wing, a registered nurse must serve on the other.

█ Petitioners assert that, in the capacity of charge nurses, licensed practical nurses supervise the certified nurses aides and that they therefore should be excluded from the bargaining unit. The NLRA defines supervisory status as follows:

> The term "supervisor" means any individual having authority in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11) (1999). "Section 2(11) powers exercised in a manner that is 'merely routine or clerical' are not suffi-

cient to show supervisory status." *NLRB v. Bakers of Paris, Inc.*, 929 F.2d 1427, 1445 (9th Cir.1991). The NLRB distinguishes "between authority arising from professional knowledge and authority encompassing front-line management prerogatives." *NLRB v. Health Care & Retirement Corp.*, 511 U.S. 571, 583, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994). It is the employer's burden of proof to demonstrate supervisory status. *Bakers of Paris*, 929 F.2d at 1445. The NLRB's determination of such supervisory status should be upheld as long as "rational and consistent with the Act." *Health Care & Retirement Corp.*, 511 U.S. at 576, 114 S.Ct. 1778. "Because the Board has expertise 'in making the subtle and complex distinctions between supervisors and employees, ... the normal deference [we] give to the Board is particularly strong when it makes those determinations.'" *Providence Alaska Med. Ctr. v. NLRB*, 121 F.3d 548, 551 (9th Cir.1997) (quoting *NLRB v. S.R.D.C., Inc.*, 45 F.3d 328, 333 (9th Cir.1995)).

█ In *Providence Alaska*, we held that registered nurses who in their capacity as charge nurses were responsible for assigning employees to tasks and patients, assessing staffing needs, calling in employees and authorizing overtime, asking employees to go home when the facility was overstaffed, approving breaks, coordinating patient care, and providing routine guidance to other employees were not supervisors within the meaning of the NLRA. *Providence Alaska*, 121 F.3d at 555. The responsibilities of the licensed practical nurses in the instant case are similar.[3] Although as charge nurses li-

---

**3.** The main difference between the two cases is that in Providence Alaska the registered nurses provided guidance to and coordinated the schedules of other registered nurses, while in this case the licensed practical nurses mostly guide and coordinate the work of certified nurses aides. This difference does not affect the result; other circuits have reached similar conclusions in cases involving licensed practical nurses who served as charge nurses and allegedly supervised nurs-

ing assistants. *See NLRB v. Grancare, Inc.*, 170 F.3d 662, 664, 668 (7th Cir.1999) (en banc) (licensed practical nurses directed work of certified nursing assistants); *Beverly Enterprises–Mass., Inc. v. NLRB*, 165 F.3d 960, 964 (D.C.Cir.1999) (licensed practical nurses and registered nurses allegedly had disciplinary authority over certified nursing assistants); *Beverly Enterprises (Lynwood) v. NLRB*, 148 F.3d 1042, 1044 (8th Cir.1998) (licensed practical nurses occasionally served as charge

censed practical nurses provide guidance to the certified nurses aides, the NLRB's finding that this guidance is such as is routinely provided by a more experienced and skilled employee, rather than a function of a supervisor-supervisee relationship, was supported by substantial evidence. *See id.* at 554 (charge nurses who guided less experienced employees were not supervisors when they were not answerable to employer for other employees' work). Furthermore, the licensed practical nurses' role in assessing the abilities of the certified nurses aides and the needs of the patients in order to make daily work assignments does not require independent judgment and therefore does not make the licensed practical nurses supervisors. *See Beverly Enterprises–Penn.,* 129 F.3d at 1270 ("assigning and monitoring the performance of discrete patient care tasks" is routine and does not require exercise of independent judgment). The charge nurses' authority to prepare daily assignment sheets, assess staffing needs, call in or send home certified nurses aides, and authorize overtime does not carry with it the authority to order staff to report and was exercised in a routine, clerical manner.[4] *See Providence Alaska,* 121 F.3d at 552–53 (charge nurses' authority to call in additional staff, authorize overtime, and ask employee to leave early "are more clerical than supervisory, and do not involve the exercise of independent judgment"); *Beverly Enterprises (Lynwood),* 148 F.3d at 1047 (employee who could not order additional staff to report was not supervisor). Petitioners' evidence offered in support of their contention that licensed practical nurses had authority to adjust grievances, evaluate and discipline employees, and effectively recommend termination merely demonstrates that licensed practical nurses had a reporting function, not that their opinions had any demonstrable effect on fellow employees' pay, benefits, or retention. The Board's view that such evidence is not sufficient to establish supervisory status is reasonable and consistent with the NLRA. *See Beverly Enterprises–Mass.,* 165 F.3d at 963–64 ("paper authority" to discipline other employees did not convey supervisory status when no evidence that authority had been exercised); *Beverly Enterprises (Lynwood),* 148 F.3d at 1046–47 (evaluation authority that primarily involves reporting does not demonstrate supervisory status); *Beverly Enterprises–Penn.,* 129 F.3d at 1270–71 (role in evaluating does not demonstrate supervisory status when evaluation had never resulted in adverse personnel action or increased pay); *George C. Foss Co. v. NLRB,* 752 F.2d 1407, 1410–11 (9th Cir. 1985) (foreman who verbally evaluated employees and made layoff and promotion recommendations was not supervisor).[5] Finally, the fact that licensed practical nurses did not serve as charge nurses unless a registered nurse was the charge nurse on the other wing of the facility

nurses for teams of registered nursing assistants); *Beverly Enterprises–Penn., Inc. v. NLRB,* 129 F.3d 1269, 1270–71 (D.C.Cir. 1997) (licensed practical nurses assigned and monitored certified nursing assistants' performance of patient care tasks). The partial dissent also considers it important that *Providence Alaska* involved an acute care facility while the Care Center provides long-term care. No party has suggested why the nature of the facility rather than the responsibilities and duties of the employee would be determinative of supervisory status. Other circuits have concluded that charge nurses in long-term care facilities were not supervisors. *See Grancare,* 170 F.3d at 668 (nursing home); *Beverly Enterprises–Mass.,* 165 F.3d at 964 (nursing and rehabilitation center); *Beverly*

*Enterprises (Lynwood),* 148 F.3d at 1048 (8th Cir.1998) (nursing home).

4. The fact that certified nurses aides are permitted, at least by some licensed practical nurses, to change assignments without approval also weighs against a finding that preparation of daily assignment sheets demonstrated supervisory status. *See Providence Alaska,* 121 F.3d at 552.

5. In reaching our conclusions, we have taken into account the difference in the conclusions reached by the ALJ and the NLRB regarding licensed practical nurses, including the fact that neither adjudicator relied on credibility determinations.

further demonstrates that the licensed practical nurses did not have ultimate supervisory responsibility. *See Providence Alaska,* 121 F.3d at 555 (fact that supervisory nurse was always on call demonstrates that charge nurses did not have ultimate responsibility).[6] As the Seventh Circuit sitting en banc recently concluded, in cases involving nurses' relationship with nursing assistants, the NLRB's distinction between independent judgment as a supervisor and professional judgment exercised in a routine manner is not arbitrary or capricious, and should be upheld. *Grancare, Inc.,* 170 F.3d at 668.

### Employees on the Hospital's payroll

 Petitioners also challenge the inclusion in the bargaining unit of a number of employees in dietary, housekeeping, and maintenance job classifications who worked predominantly at the Care Center but were on the Hospital's payroll, and raise this as a defense to their failure to bargain. *See NLRB v. Burns,* 406 U.S. 272, 280, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) (bargaining obligation depends on appropriateness of bargaining unit). The NLRB's designation of a bargaining unit "will not be overturned unless there is an abuse of discretion, the Board acted in an arbitrary, unreasonable, or capricious fashion, or the unit is in violation of statute." *NLRB v. Marin Operating, Inc.,* 822 F.2d 890, 893 (9th Cir.1987) (quoting *NLRB v.*

*Mercy Hospitals of Sacramento, Inc.,* 589 F.2d 968, 972 (9th Cir.1978)).

We uphold the NLRB's finding. These employees worked at the Care Center, were subject to the Care Center's personnel policies and procedures, and were paid according to the Care Center's pay matrix. The fact that these job classifications were moved to the Hospital's payroll did not alter the employees' community of interest with other employees working at the Care Center, particularly given the Board's finding that the Care Center, the Hospital and NMHCI constituted a single employer. This finding was supported by substantial evidence in the record regarding the "interrelation of operations, common management, centralized control of labor relations and common ownership" of the three entities. *South Prairie Const. Co. v. Operating Eng'rs,* 425 U.S. 800, 802 n. 3, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (quoting *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service,* 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965)).

The NLRB properly found that the change in the composition of the bargaining unit was negligible and that the previous unit remained appropriate. Similar variances have been found insubstantial in other cases.[7] To the extent that the successorship context affects our analysis, it makes variance in the bargaining unit even more likely and understandable, and pro-

---

**6.** The "secondary indicia" of supervisory authority are only relevant "[i]n borderline cases." *NLRB v. Chicago Metallic Corp.,* 794 F.2d 527, 531 (9th Cir.1986). We therefore do not consider them here.

**7.** See *David Wolcott Kendall Memorial School v. NLRB,* 866 F.2d 157, 161–62 (6th Cir.1989) (difference of five employees in 40–member unit "inconsequential"); *NLRB v. Gogin,* 575 F.2d 596, 604 n. 15 (7th Cir.1978) (addition of one member in different job classification to twelve-member unit was "minimal variance and insufficient to justify the Company's refusal to bargain"); *NLRB v. Fosdal,* 367 F.2d 784, 787 (7th Cir.1966) (union's exclusion of three employees from ten-member bargaining unit "was an insubstantial variance" when performed similar work and majority status

unaffected); *Industrial Union of Marine & Shipbuilding Workers v. NLRB,* 320 F.2d 615, 617–18 (3d Cir.1963) (erroneous inclusion of supervisory employees that would not have affected union's majority support would not excuse employer's failure to bargain); *Brewery & Beverage Drivers & Workers v. NLRB,* 257 F.2d 194, 196 (D.C.Cir.1958) (union's failure to include 14 employees in addition to 44 driver-salesmen was not substantial variance justifying employer's refusal to bargain); *Dan River Mills, Inc.,* 121 NLRB 645, 650–61 (1958) ("[E]ven when guards are improperly included in the unit for which a union seeks to bargain, this is no defense to a charge [against an employer] of a refusal to bargain").

vides further reason to uphold the NLRB's determination. *See Hydrolines, Inc.,* 305 NLRB 416, 420 & n. 27 (1991) (in contrast to initial bargaining situation, in which union best knows which employees it has organized and seeks to represent, employer has most access to knowledge regarding appropriate bargaining unit in successorship situation). For this reason, the D.C. Circuit has held that successorship obligations are imposed even when only a small subset of the bargaining unit moves over to the successor employer, since precedent requires only "that the acquired employees must be in appropriate units both before and after successorship." *International Union of Petroleum & Industrial Workers v. NLRB,* 980 F.2d 774, 780 (D.C.Cir.1992).

### Good faith doubt as to the Union's continued majority support

The Board's finding that the Care Center was a legal successor to the Lutheran Home entitles the Union to a presumption of continued majority support, which in turn requires continued recognition and bargaining unless the employer can demonstrate a good faith doubt based on objective evidence of the Union's majority support. *See Fall River Dyeing & Finishing Corp.,* 482 U.S. at 41, 107 S.Ct. 2225. An employer asserting a good faith doubt must provide objective evidence such as the expression of dissatisfaction with the union by a significant minority of union members. *See Allentown Mack Sales & Service, Inc. v. NLRB,* 522 U.S. 359, 118 S.Ct. 818, 824–25, 139 L.Ed.2d 797 (1998). Petitioners point to a number of events that they contend gave them reason to doubt the Union's support. First, during negotiations over aspects of the change in ownership that affected the Union's members, a Union representative stated that the Union planned to conduct an "old-fashioned" organizing campaign.

Second, during the time that employees were applying to stay in their positions, the Union began a campaign to collect authorization cards. Third, the Union's letter demanding recognition did not expressly rely on the Care Center's obligation as a successor employer and was identical to other letters sent in the context of organizing drives. And finally, petitioners argue that their doubt about the appropriateness of the inclusion of licensed practical nurses and Hospital employees in the bargaining unit provided a basis for their good faith doubt of the Union's majority status.

We uphold the NLRB's finding that evidence of employee dissatisfaction with the union was minimal and that the organizing campaign itself did not provide sufficient grounds for doubting the Union's majority support. *See Decor Noel, Inc.,* 283 NLRB 911, 914–15 (1987).[8] Petitioners' argument that "the Union's organizing activity suggested the absence of majority support, since (from the Care Center's perspective) the Union had no reason to engage in an organizing campaign if it already had bargaining rights or majority support" is simply not true. A prudent union might well engage in activities designed to strengthen its support among its members when a change in ownership occurs. It may be concerned, for example, that a successor employer will attempt by one means or another to defeat its representational rights or challenge the appropriateness of the bargaining unit. Obtaining the *renewed* support of its membership in these circumstances is not evidence of a lack of a majority.

In fact, most of the evidence presented by petitioners supported their claim of a good faith doubt regarding their *successorship* obligations, not as to whether the Union had majority support among the

---

8. In the case cited by petitioners in which the Tenth Circuit considered an organizing drive as evidence of the union's lack of majority support, the organizing drive had been unsuccessful and many other factors were present (for example, the hiring of permanent replacements and the union's abandonment of the workforce). *See NLRB v. Oil Capital Electric, Inc.,* 5 F.3d 459, 461–63 (10th Cir.1993).

members. The NLRB's rejection of Petitioners' proposed extension of the good faith doubt doctrine to excuse a refusal to bargain when an employer has doubts about its successorship obligation was eminently reasonable and consistent with the NLRA.

### Failure to name the Hospital

 We differ in only one respect with the NLRB. Because only NMHCI and the Care Center were named in the General Counsel's complaint, the Hospital cannot be bound by the enforcement order. Even though the three entities constitute a single employer, and their interests are therefore almost identical, due process is violated when a separate corporate entity has no notice that its interests will be adjudicated and that it will be bound by the order that the NLRB issues. Although "[a]ctions before the Board are not subject to technical pleading requirements that govern private lawsuits[,]" *NLRB v. IBEW*, 827 F.2d 530, 534 (9th Cir.1987), this does not allow adjudication of a party's interests without formal notification to that party. *See NLRB v. H.P. Townsend Mfg. Co.*, 101 F.3d 292, 295–96 (2d Cir. 1996) (even if party knew of allegations of alter ego status and of effort to include them in the proceedings, formal service of complaint was still required). Therefore, the Hospital is not properly named as a party that is bound by the NLRB's enforcement order. This, however, does not affect the Board's single employer finding, nor the composition of the unit; nor does it affect enforcement of the order against the Care Center and NMHCI.

### CONCLUSION

The decision and order of the NLRB is AFFIRMED and the petition for enforcement is GRANTED, except that the order may not be enforced against the Hospital.

THOMAS, Circuit Judge, concurring in part and dissenting in part:

I concur in all of the majority opinion except for the determination that licensed practical nurses are not supervisors. The duties of licensed practical nurses in a long-term care nursing home, such as the Northern Montana Health Care Center, differ markedly from those in an acute care facility, such as the one involved in *Providence Alaska Medical Center v. NLRB*, 121 F.3d 548 (9th Cir.1997). The evidence in this case demonstrated that, as the Administrative Law Judge concluded after conducting a thorough hearing. Substantial evidence supports this finding. Thus, I agree with the assessment by the Administrative Law Judge that licensed practical nurses should not form part of the bargaining unit pursuant to *National Labor Relations Board v. Health Care and Retirement Corporation of America*, 511 U.S. 571, 573–74, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994).

Nonetheless, because the number of employees involved was insubstantial, the employer was not relieved of its responsibility to bargain with the unit. *See David Wolcott Kendall Memorial School v. NLRB*, 866 F.2d 157, 161–62 (6th Cir.1989). The application of the insubstantial variance rule is particularly appropriate in the successorship context when (1) the historic bargaining unit had included the disputed employees, and (2) the employer did not tender sufficient evidence of a substantial possibility that exclusion of the licensed practical nurses would have altered an election outcome or fragmented the unit. *See Stewart Granite Enterprises v. United Steelworkers of America*, 255 NLRB 569, 1981 WL 20317 (1981).

Thus, I concur in the judgment, but respectfully disagree with some of the rationale upon which it is based.