*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0217P (6th Cir.)
File Name: 03a0217p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONAL LABOR RELATIONS
BOARD,

*Petitioner,*

*v.*

DOLE FRESH VEGETABLES,
INC.,

*Respondent.*

No. 01-1978

On Application for Enforcement of an Order of
the National Labor Relations Board.
No. 9-CA-38306.

Argued: May 7, 2003

Decided and Filed: May 28, 2003[*]

Before: SUHRHEINRICH and COLE[**], Circuit Judges;
CARR, District Judge.

---

[*] This decision was originally issued as an "unpublished decision" filed on May 28, 2003. On June 24, 2003, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

---

## COUNSEL

**ARGUED:** David Seid, NATIONAL LABOR RELATIONS BOARD, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., for Petitioner. Theodore R. Scott, LUCE, FORWARD, HAMILTON & SCRIPPS, San Diego, California, for Respondent. **ON BRIEF:** David Seid, Sharon I. Block, Aileen A. Armstrong, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. Theodore R. Scott, Michelle A. Herrera, LUCE, FORWARD, HAMILTON & SCRIPPS, San Diego, California, for Respondent.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. The National Labor Relations Board ("NLRB" or the "Board") petitions this Court for enforcement of its order issued against Dole Fresh Vegetables, Inc. ("Dole" or the "Company"). The Board found that Dole violated Sections 8(a)(5) and (1) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(1) and (3) (1998), by refusing to bargain with the duly elected labor union as the certified representative of a unit of Dole's employees. The issues on appeal are: (1) whether the Board reasonably concluded that two employees were not supervisors under Section 2(11) of the Act, 29 U.S.C. § 152(11) (1998); and (2) whether the Board abused its discretion by overruling Dole's objections to its decision without holding a post-election hearing to determine whether the two employees at issue should be classified as supervisors under Section 2(11) of the Act.

For the reason stated below, we **GRANT** the Board's petition for enforcement.

## I. Background

Dole operates a plant in Springfield, Ohio that processes and distributes fresh vegetables. The plant employs approximately 310 employees, of which fifteen are maintenance employees. The plant operates three shifts, with production occurring in the first two shifts. Production is run at the plant for five or six days a week from about 7:30 a.m. until it is complete, usually around 12:00 a.m. The plant manager, Lenny Pelifian, is in charge of daily plant operations. In the maintenance department, the maintenance manager reports directly to Pelifian, but at the time of the pre-election hearing the position was vacant and Pelifian was serving as the acting maintenance manager. Two shift maintenance supervisors ("shift supervisors"), one for first shift and the other for the second shift, reported to Pelifian in his capacity as acting maintenance manager. Both the maintenance manager and the shift supervisors grant time off, approve overtime, and issue disciplinary warnings.

Maintenance employees are classified as maintenance leads ("leads"), maintenance packaging technicians, maintenance technicians, and maintenance parts clerks, and they all receive an hourly wage. Leads and maintenance technicians work on each shift, and the leads are usually the most experienced maintenance employees and report directly to the shift supervisors. At the time of the pre-election hearing the lead position for the first shift was vacant. During the third shift, the lead reports to the second-shift supervisor for the first two hours and then to the third-shift sanitation supervisor.

Generally, maintenance employees prepare Dole's equipment and machinery for production, referred to as "startup work," monitor production equipment, repair equipment, perform preventive maintenance and rebuild equipment. The leads spend about half of their time performing the various maintenance tasks and the other half preparing shift notes and doing related tasks. The leads are not able to schedule employees, grant time off, or authorize overtime, and they do not review the work performed by the

technicians. The maintenance technicians spend about half of their time monitoring the equipment and the other half divided between performing startup work, addressing breakdowns, rebuilding equipment and performing preventive maintenance. The maintenance parts clerks ensure that there is an adequate inventory of parts available for the equipment and the plant overall. They do not work on the production floor and spend their time in the maintenance shop area.

The maintenance technicians do not receive specific instructions for their jobs from a shift supervisor or lead for startup work because the assigned tasks are routine. They do, however, receive work orders prepared by a shift supervisor specifying tasks to perform during the shift. The shift supervisors give the work orders to the leads who then pass along the orders to the maintenance technicians. After each shift ends, the maintenance technicians give the leads a list of the work completed by the technicians and the leads compile "shift notes" for the maintenance managers to use when preparing for the next shift.

### A. The Representation Proceeding

On July 31, 2000, the International Union of Operating Engineers, Local 20 (the "Union") filed a representation petition with the Board seeking certification as the representative of eighteen maintenance employees. The Company opposed the petition, arguing that some of the employees the Union wanted to include should not be included, and that the lead position was supervisory and had to be excluded from the bargaining unit under the Act. Title 29 U.S.C. § 164(a) provides in relevant part:

Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

29 U.S.C. § 164(a) (1998). Section 2(11) of the Act defines a supervisor and reads:

> (11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11) (1998); *see also* 29 U.S.C. § 152(3) (1998) ("The term 'employee' shall include any employee . . . but shall not include . . . any individual employed as a supervisor. . . .").

A pre-election hearing was conducted by Charles H. Brooks, a Hearing Officer for the Board, on August 30, 2000, to determine whether the two leads, Larry Saunders and Robert Ford, were eligible for inclusion in the bargaining unit. At that hearing, both parties were represented by counsel, presented witnesses, cross-examined witnesses and introduced evidence. Following the pre-election hearing, the Board's Regional Director, Richard L. Ahearn, issued a Decision and Direction of Election on September 19, 2000. After reviewing the hearing transcript and examining the evidence, he made several findings including: (1) that an appropriate unit of employees (the "Unit") under Section 9(a) of the Act existed at the plant for purposes of collective bargaining; and (2) that Saunders and Ford were not supervisors within the meaning of Section 2(11) of the Act and therefore did not need to be excluded from the bargaining unit. The Regional Director also directed an election by secret ballot among the employees in the Unit to determine whether they wanted to be represented by the Union. A secret ballot was conducted on October 19, 2000. After the election, Dole filed a Request for Review of the Regional Director's Decision and Direction of Election. On October 24, 2000, the

Board issued an Order denying Dole's request. The ballots were counted in the presence of Dole and the Union on October 31, 2000 and the results were as follows:

Approximate number of eligible voters ...............17
Number of void ballots ...........................................0
Number of votes cast for the Union .....................14
Number of votes cast against the Union.................2

Upon losing the election by a vote of 14 to 2, Dole filed seven objections to the election. The first four objections alleged that Saunders and Ford engaged in conduct "interfering with the election or in conduct affecting the results of the election." The final three objections alleged that the Board engaged in objectionable conduct by including Saunders and Ford in the appropriate bargaining unit and by failing to dismiss the petition for representation due to "supervisory taint" of the election resulting from the activities of Saunders and Ford. The Regional Director issued a Supplemental Decision and Certification of Representative on November 21, 2000. He concluded: (1) that the issues regarding the supervisory status of Saunders and Ford were fully litigated in the pre-election hearing and that there was no additional evidence to support a departure from that previous finding; and (2) that Dole was not entitled to an evidentiary hearing on its objections. The Regional Director then overruled all of Dole's objections and certified the Union as the exclusive representative of the employees in the Unit. Dole submitted a Request for Review of the Regional Director's November 21, 2000 decision. On January 3, 2001 the Board denied the request.

### B. The Unfair Labor Practice Proceeding

Following certification, Dole refused to recognize and bargain with the Union. The Union charged Dole with unfair labor practices in violation of Sections 8(a)(5) and (1) of the Act, which make it unlawful:

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
. . .
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

§§ 158(a)(1), (5).  The Board's Acting General Counsel issued a Complaint and Notice of Hearing, alleging that Dole refused to bargain with the Union.  After Dole filed an answer, the Acting General Counsel filed a motion for summary judgment with the Board on March 27, 2001.  The Board issued a Decision and Order on May 11, 2001.  In its findings of fact, the Board found that the Union was properly certified and that Dole had violated Sections 8(a)(5) and (1).  The Board ordered Dole to cease and desist from refusing to bargain with the Union, to put any agreement with the Union in writing, and to post an appropriate notice regarding the Board's decision at the Dole plant.  The Board petitioned this Court for enforcement of its Order on July 18, 2001.

## II.  Discussion

### A.  The Conclusions of the Regional Director

#### 1.  Standard of review

The scope of our review of determinations by the Board is limited.  *See* 29 U.S.C. §§ 160(e) (1998) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.").  We review factual findings of the NLRB to determine if they are "supported by substantial evidence on the record considered as a whole."  *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995).  "Substantial evidence" is evidence that is "adequate, in a reasonable mind, to uphold the [Board's] decision."  *NLRB v. Gen Fabrications Corp.*, 222 F.3d 218 (6th Cir. 2000) (quoting *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985) (per curiam)).  We also review the Board's application of the law to the facts

under the substantial evidence standard.  *Turnbull Cone Baking Co.*, 778 F.2d at 295.  We may not displace the Board's reasonable inferences even if we would have reached a different conclusion.  *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 313 (6th Cir. 1987) (per curiam).  Additionally, we limit our review of credibility determinations and accept those made by the Board unless they have "no rational basis."  *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 242 (6th Cir. 1983) (per curiam).

#### 2.  Analysis

The Supreme Court has held that an individual is a supervisor within the meaning of Section 2(11) of the Act if he: (1) has the authority to engage in one of the twelve statutorily enumerated activities; (2) uses independent judgment in exercising that authority; and (3) holds that authority in the "interest of the employer."  *NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 573-74 (1994).

In his decision, the Regional Director noted that "the Employer has not met its burden to establish that Ford and Saunders are supervisors within the meaning of Section 2(11) of the Act."  The Regional Director found that Dole had not established the first part of the *Health Care* test - that the leads had the authority to engage in one of the twelve activities enumerated in Section 2(11).

The Act does not expressly allocate the burden of proving or disproving a challenged employee's supervisory status, and the Board has adopted the rule that the burden of proving that an individual is a supervisor rests on the employer.  *See, e.g., Integrated Health Servs. of Mich. at Riverbend*, 324 NLRB 26 (1997); *Beverly Enters.-Ohio d/b/a Northeast Nursing Home*, 313 NLRB 491 (1993).  In his supplemental decision, the Regional Director addressed the issue of burden of proof:

Although I found the Decision in the instance case that the Employer had not met its burden to establish that Saunders and Ford are supervisors within the meaning of Section 2(11) of the Act, such finding is consistent with

the Boards established standard that the burden of proving that an individual is a supervisor rests on the party contending supervisory status. I am constrained to follow extant Board law and I do not have the discretion to review, change or overrule the Board's legal precedent.

(citations omitted). Contrary to the position of the Board, this Circuit previously has held that the Board has the burden of proving that employees are not supervisors. *Integrated Health Servs. of Mich., at Riverbend, Inc. v. NLRB*, 191 F.3d 703, 707 (6th Cir. 1999) ("We have repeatedly explained that '[t]he Board has the burden of proving that employees are not supervisors.' *Grancare*, 137 F.3d at 372."); *Grancare, Inc. v. NLRB*, 137 F.3d 372, 375 (6th Cir. 1998) ("The Board has the burden of proving that employees are not supervisors.").

However, in *NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706 (2001), the Supreme Court directly addressed this Circuit's position on the allocation of the burden of proof in Section 2(11) cases:

The Board argues that the Court of Appeals for the Sixth Circuit erred in not deferring to its resolution of the statutory ambiguity, and we agree. The Board's rule is supported by "the general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). . . . The burden of proving the applicability of the supervisory exception, under *Morton Salt*, should thus fall on the party asserting it. . . . We find that the Board's rule for allocating the burden of proof is reasonable and consistent with the Act, and we therefore defer to it. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 402-403, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

*Ky. River*, 532 U.S. at 711-12. Therefore, we must accept the Board's rule that Dole has the burden of proving that the leads

are supervisors, and we review the record as a whole to determine whether the Board's decision on this issue is supported by substantial evidence. *See Highland Superstores, Inc. v. NLRB*, 927 F.2d 918, 923 (6th Cir. 1991).

The Regional Director began his discussion in his September 19, 2000 Decision and Direction of Election regarding the status of the leads by comparing the leads with the shift supervisor positions. He noted that shift supervisors do not rotate shifts, have offices, are salaried employees, and receive different health care coverage than leads. The Regional Director found that Saunders and Ford did not "possess any indicia of supervisory authority within the meaning of Section 2(11) of the Act. Thus the record establishes that they do not have the authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, discipline, responsibly to direct the work of employees or to adjust their grievances, in a manner requiring the exercise of independent judgment."

We have held that "[i]t also bears emphasis that § 2(11) uses the disjunctive 'or' in listing the numerous indicia of supervisory status." *Beverly Cal. Corp. v. NLRB*, 970 F.2d 1548 (6th Cir. 1992) (citing *NLRB v. Medina County Publ'ns, Inc.*, 735 F.2d 199, 200 (6th Cir. 1984)). An individual who possesses authority in any one of the listed categories is a supervisor, according to the statute, as long as such authority is to be exercised "in the interest of the employer" and as long as its exercise "is not of a merely routine or clerical nature, but requires the use of independent judgment." *Id*. at 1552. Because Dole has the burden of proving that the leads are supervisors, we evaluate the specific arguments presented by Dole in support of its assertion that Saunders and Ford are statutory supervisors. Dole argues that the leads have the same authority as the shift supervisors, and Dole focuses its argument on the lead's ability to assign and responsibly direct employees, recommend raises, promote and reward employees, discipline and hire employees, and adjust grievances.

### a. Assigning and responsibly directing employees

Dole argues simply that the leads have discretion with respect to whether certain work should or should not be performed in the plant. The Company provides no support for this assertion, however. As the Regional Director found, the leads do not assign tasks to packaging or maintenance technicians. The work orders are prepared by the shift supervisors and the leads give these orders to the technicians. At the end of a shift, the leads simply prepare shift notes, which detail the work performed during the shifts. They have no authority to prioritize or assign the work as they merely record what work already has been performed. Additionally, there is no evidence that the leads assign the preventive or equipment rebuilding work. The preventive maintenance work that is to be done on the various production machines is generated by a computer according to a preset schedule. Though the leads and other maintenance employees decide when they will have time during their shift to perform the preventive work, the leads have no authority to assign that work. Because Dole has presented no evidence regarding the assignment of rebuild work, its claim in that regard is without merit. Therefore, we find that the Regional Director's conclusion that the leads do not have the ability to assign and responsibly direct employees is supported by substantial evidence.

### b. Recommending raises, promoting and rewarding employees

Relying only on the testimony of Pelifian, Dole argues that the leads have the authority to recommend raises and that they are involved in the evaluation of employees. However, there is nothing of record to support this argument. Pelifian admitted at the pre-election hearing that neither Saunders nor Ford had ever signed a raise recommendation. Saunders and Ford testified that in 1998 they completed evaluations of employees on their shifts because there were no supervisors at the time to do the evaluations. However, after the supervisor position was filled, neither one completed another

evaluation. The Regional Director found that although Ford prepared evaluations for three employees and gave input on which ratings the employees would receive, Saunders gave no input to the maintenance manager on the employees that he evaluated and merely agreed with the maintenance manager's determinations of the employees' performance. We agree with the Regional Director's conclusion that an isolated instance of involvement in the evaluation process does not confer statutory supervisory authority on the leads. Because Dole is unable to provide any evidence, apart from the testimony of Pelifian, that Saunders and Ford possessed the authority to recommend raises or promote or reward employees, the Regional Director's conclusion that they did not perform these tasks is supported by substantial evidence.

### c. Disciplining employees

Dole argues that the leads have the same authority to discipline employees as the shift supervisors. The Company points to evidence that both Saunders and Ford each have completed and signed an Employee Warning Notice, which are written warnings to employees. However, both Saunders and Ford testified that they were instructed by the maintenance manager to complete the notices, to have the employees sign them, then to sign the notices themselves. Saunders and Ford exercised no independent judgment about whether to fill out the notices or their content because they simply were following the instructions of the maintenance manager. Apart from the general statement by Pelifian that the leads had the authority to discipline employees and the two notices discussed above, Dole has provided no other support for its assertion that Saunders and Ford possessed the authority to discipline employees and used that authority in a supervisory manner. Therefore, we find that the Regional Director's conclusion that the Company has failed to present evidence on this point is supported by substantial evidence. *Highland Superstores*, 927 F.2d at 922 ("[A] solitary instance of discipline is not sufficient to confer supervisory status as a matter of law.").

#### d.  Hiring employees

Dole also argues that the leads were actively involved in the hiring process.  The Company contends that the leads participate in interviews and have input into whether a candidate is hired.  Pelifian testified that he assumed that the leads were involved in the hiring process, but that he had no actual knowledge of the leads' involvement in hiring.  The only evidence of the leads' participation in hiring is that Saunders was asked once by the shift supervisor to interview a prospective employee.  The shift supervisor requested that Saunders ask a few questions regarding the applicant's electrical experience because Saunders is an electrician.  Saunders asked the applicant four questions and passed along to the shift supervisor his opinion on the applicant's electrical experience and knowledge.  The supervisor did not ask Saunders for his recommendation about whether to hire the candidate nor was Saunders otherwise involved in the hiring decision.  Other than this instance, Dole has failed to present any evidence that the leads possessed the authority to hire employees or to make hiring recommendations.  Therefore, we find that the Regional Director's conclusion that the leads were unable to hire employees is supported by substantial evidence.

#### e.  Handling employee grievances

Dole contends that the leads have the authority to adjust the grievances of employees and that they exercise their independent judgment in doing so.  Dole supports this contention by reference to the testimony of Pelifian that the leads try to help employees resolve problems that they may be having in working with one another.  However, Pelifian testified that he had no specific knowledge of the leads assuming such a role.  The record contains no evidence that the leads ever adjusted employee grievances, and the Regional Director found that the "the role of the maintenance leads in grievance handling is sparse. . . ."  We thus find that the Regional Director's conclusion that the leads were not

involved in adjusting employee grievances is supported by substantial evidence.

#### f.  Secondary indicia of supervisory status

Finally, Dole argues that there are numerous secondary indicia of supervisory status including: that the leads are held out to the employees in the plant as management; that the leads are included on Dole's emergency contact list; that the leads may access the Company's computer network and have plant e-mail addresses; that the leads participate in management training on topics such as motivating employees, disciplining employees and sexual harassment; that the leads were responsible for supervising employees on the third shift when the shift supervisor position was vacant; and that the leads received $3.00 per hour more than other hourly employees in the department.

Although we have not previously determined the weight to be afforded secondary indicia of supervisory status, other Circuits have held that secondary indicia should be relied upon in limited circumstances.  *See, e.g., N. Mont. Health Care Ctr. v. NLRB*, 178 F.3d 1089, 1096 n.6 (9th Cir. 1999) ("The 'secondary indicia' of supervisory authority are only relevant '[i]n borderline cases.'") (quoting *NLRB v. Chicago Metallic Corp.*, 794 F.2d 527, 531 (9th Cir.1986)); *NLRB v. Attleboro Assocs., Ltd.*, 176 F.3d 154, 163 n.5 (3d Cir. 1999) (explaining that the Third Circuit relies on the statutory text and not secondary indicia in determining statutory status); *E & L Transp. Co. v. NLRB*, 85 F.3d 1258, 1270 (7th Cir. 1996) ("Although not determinative on their own, where one of the enumerated indicia in § 152(11) is present, secondary indicia support a finding of statutory supervisor.").  *But see Entergy Gulf States, Inc. v. NLRB*, 253 F.3d 203, 209 (5th Cir. 2001) ("[S]econdary indicia of supervisory authority may be pertinent. . . .").  Morever, the Board has held consistently that secondary indicia of supervisory status are not dispositive without evidence of at least one primary indicator of supervisory status.  *See, e.g., Billows Elec. Supply of*

*Northfield, Inc.*, 311 NLRB 878 n.2 (1993); *Juniper Indus., Inc.*, 311 NLRB 109, 110 (1993).

In his decision, the Regional Director noted the Board's position on secondary indicia and concluded that none of the secondary indicia advanced by Dole, in the absence of primary indicia, established that Saunders and Ford were supervisors. We agree with this position. The evidence presented does not support Dole's argument that secondary indicia of supervisory status should weigh heavily in its favor. Most important, there being no evidence to support a finding of supervisory status under the statute, we would have to find the secondary indicia to be determinative. Even if we were to accept that secondary indicia may be used in order to find supervisory status under Section 2(11), the secondary indicia put forth by Dole are unpersuasive.

Dole has presented no evidence to support its argument that various secondary indicia lead to the conclusion that the leads are statutory supervisors. Two employees, Eric Clarkson and Terry Baugh, testified that they do not consider the leads supervisors, and Dole presented no evidence that the leads are held out to employees as supervisors. Also, the Company has not indicated how the inclusion of the leads on the emergency contact list and their access to the Company computer network support a finding that the leads have supervisory status. Furthermore, though there was evidence presented that Saunders and Ford were required to attend a management meeting, Saunders testified that he and the other two leads in attendance, including Ford, had no idea why they had been asked to attend a meeting geared toward supervisory employees. We do not find that mere attendance at such a meeting confers upon the leads supervisory authority absent other evidence to support a finding that the leads possessed the authority to perform supervisory tasks.

Dole also argues that the leads were supervisors because there was no shift supervisor for the third shift at the time of the hearing and the leads filled the supervisor's role during that shift. However, the Company has failed to present any

evidence that the leads performed supervisory tasks when they worked during the third shift. There was testimony that the sanitation supervisor on duty during the third shift handled all the supervisory issues for the maintenance employees. The work orders for the third shift were left by the second-shift supervisor and the second-shift supervisor was present during the first two hours of the third shift. Therefore, there is no evidence to support Dole's argument that the leads exercised any supervisory duties during their third-shift rotations when the third-shift supervisor position was vacant. *See Highland*, 927 F.2d at 922 (explaining that the highest-ranking employees on-site at a given time are not "ipso facto" made into supervisors simply because of their presence.)

Finally, Dole argues that the difference in pay between the leads and the other maintenance employees indicates that the leads were supervisors. This argument is without merit. Though the leads have higher hourly salaries, there is no evidence that this alone distinguishes them as supervisors. The other maintenance employees are paid hourly as well and they receive the same health benefits as the leads. The shift supervisors, in contrast, are salaried and receive different health benefits, though the record does not reflect how the two health coverages differ. Therefore, Dole's naked assertion that the difference in hourly pay between the leads and the other maintenance employees distinguishes the leads as supervisors does not support a conclusion that the leads are supervisory as defined under Section 2(11).

### g.  Credibility determinations made by the Regional Director

In its final challenge to the Regional Director's decision, Dole argues that the Regional Director made credibility determinations when it evaluated the record because the testimony of Pelifian was contrary to that of Saunders and Ford regarding the tasks and authority of the leads. As an example, Dole argues that Pelifian testified that he had communicated to Saunders and Ford that they had the

authority to perform such tasks as disciplining employees and recommending raises; Saunders and Ford both testified that Pelifian never communicated to them that they possessed such authority. Dole argues that because the Regional Director found that Saunders and Ford did not have such authority, the Regional Director credited their testimony over the testimony of Pelifian.

Dole misunderstands the basis of the Regional Director's conclusions. The Regional Director found that the Company was unable to present any evidence to support a finding that Saunders and Ford performed any of the twelve enumerated activities listed in Section 2(11). In so doing, the Regional Director did not make credibility decisions. Rather, he concluded that based on the evidence before him, Dole failed to provide sufficient support for Pelifian's general statements about the nature of the work performed by the leads. Dole relied almost exclusively on the testimony of Pelifian who testified that leads:

> [H]ave the same duties as a supervisor except it's on a smaller scope. They can recommend raises, promotions, anything like that. They can recommend job bids awarding. They can discipline. They can schedule their employees when to come in and when to come out. They have access to the e-mail system and they attend all management meetings that we have.

However, the Company did not present any specific evidence to support Pelifian's statements. Accordingly, we find that the Regional Director did not err in determining that the Company had failed to meet its burden to establish that Saunders and Ford were supervisors under Section 2(11).

### B. Dole's Due Process Argument

Dole also argues that its due process rights were violated because evidentiary conflicts were decided without a hearing. Specifically, Dole argues that, after it filed objections to the Regional Director's decision, it should have been granted an evidentiary hearing on whether Saunders and Ford were

supervisors after the Regional Director found that they were not. Dole argues that a hearing was necessary because the Regional Director resolved credibility issues in favor of the Union in its finding that the leads were not supervisors.

We review the Board's denial of an evidentiary hearing for an abuse of discretion. *NLRB v. Gormac Custom Mfg., Inc.*, 190 F.3d 742, 746 (6th Cir. 1999). In *Office Depot, Inc. v. NLRB*, 184 F.3d 506, 510 (6th Cir. 1999), we stated that: "This Court has validated the Board's long standing policy of conducting evidentiary hearings only when objecting parties show the existence of 'substantial and material factual issues.' 29 C.F.R. 102.69(d); *NLRB v. Tennessee Packers, Frosty Morn Div.*, 379 F.2d 172, 177-78 (6th Cir. 1967)."

On October 24, 2000, the Board denied Dole's Request for Review because the request "raise[d] no substantial issues warranting review." Dole presented no new evidence as to the supervisory activities of the leads in its Request for Review. Instead, the Company relied on post-election declarations by two other employees and Pelifian regarding the activities of leads. As the Regional Director concluded in his November 21, 2000 supplemental decision, Dole has failed to present any evidence that the duties of leads changed between the pre-election hearing and the election. We also find that Dole has not shown that substantial and material factual issues have yet to be resolved. The additional evidence that Dole seeks to present does not go specifically to establishing that the leads had the authority to perform any of the activities listed in Section 2(11). The declarations that Dole presented after the pre-election hearing are either from witnesses that could have testified, or did testify, at the pre-election hearing.

Furthermore, the Regional Director found that the issue of the leads' supervisory status had already been fully litigated, with both parties having the opportunity to obtain subpoenas and present witnesses and evidence. We agree. Given these facts, we find that the Board did not abuse its discretion in denying Dole an evidentiary hearing on the issue of the

supervisory status of the leads. Essentially, Dole would like another opportunity to argue its claim, given that it was unable to present sufficient evidence to support its claim at the first hearing. Absent Dole raising substantial and material factual issues as to the actual duties and responsibilities of the leads, the law does not permit yet another bite at the same apple. Accordingly, the Board's decision to deny the Company's request for an evidentiary hearing was not an abuse of discretion.

Furthermore, because we conclude that the Regional Director's finding that the leads are not supervisors is supported by substantial evidence, Dole is not entitled to an evidentiary hearing on whether Saunders and Ford unlawfully tainted the election. Therefore, it was not an abuse of discretion for the Board to deny Dole's request for an evidentiary hearing on this issue.

### III. Conclusion

For the foregoing reasons, we **GRANT** the Board's petition for enforcement.